# Supreme Court of Texas

No. 21-0355

Austin Trust Company as Trustee of the Bob and Elizabeth
Lanier Descendants Trusts for Robert Clayton Lanier,
Jr., et al.,

*Petitioners*,

v.

Jay Houren, as Independent Executor of the Estate of
Robert C. Lanier, Deceased,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued October 4, 2022**

JUSTICE LEHRMANN delivered the opinion of the Court.

The issues in this case involve the scope and validity of liability releases in a family settlement agreement relating to the administration of a decedent's estate. Some of the parties to that agreement were the remainder beneficiaries of a marital trust, of which the decedent had been the trustee and sole beneficiary during his life. After executing the agreement, the trust beneficiaries demanded that the estate's executor reimburse the trust millions of dollars in funds the trust had allegedly

loaned to the decedent. The executor rejected the claim, and in the ensuing litigation, the beneficiaries assert both that the executor is liable for the unpaid debt and, alternatively, that the decedent, as trustee, had distributed those funds to himself in violation of the trust's terms. The beneficiaries contend the settlement agreement does not bar their claims because the beneficiaries lacked the statutory "full information" to which they were entitled in order to release a trustee from liability. The trial court rendered summary judgment for the estate's executor, and the court of appeals affirmed.

We hold that (1) the executor's obligation under the family settlement agreement to pay all debts and claims of the Estate does not override the releases' applicability to the trust beneficiaries' claims; (2) the executor did not owe a fiduciary duty to the trust beneficiaries, who were not devised any probate assets; and (3) assuming the statutory conditions governing beneficiary releases of trustee liability—most notably, the requirement that the beneficiary be acting on "full information" in executing the release—cannot be waived, the executor provided such information, thereby rendering the releases enforceable. Accordingly, we affirm the court of appeals' judgment.

## I. Background

Bob Lanier's first wife Elizabeth died in 1984, survived by Bob and their five children (the First Marriage Children). After Elizabeth died, Bob married Elyse Lanier. Bob and Elyse were married for over thirty years until Bob's death in 2014.

Elizabeth's will established the Robert C. Lanier Marital Trust, which was funded by approximately $54 million in assets—most of

Elizabeth's half of the community estate. The will named Bob sole trustee and sole beneficiary of the Marital Trust during his life and directed that he receive all the trust income for life, as well as "such amounts of the principal of the trust as Trustee in its sole judgment may determine are necessary for his health, support, or maintenance in his accustomed standard of living." Upon termination of the Marital Trust at Bob's death, Elizabeth's will directed that the remaining principal be disbursed in equal shares to the First Marriage Children, subject to Bob's special testamentary power of appointment exercisable "in favor of any one or more of a group consisting of [Elizabeth's] issue, spouses of [Elizabeth's] issue, and charities[.]"

The only check on Bob's authority as trustee to invade the trust principal was a flexible directive requiring Bob to "consider resources reasonably available to him." Elizabeth's will also declared that the trustee "shall never have personal or corporate liability for making or failing to make any discretionary distributions to any beneficiary" and that "any doubt in making or failing to make any discretionary distribution of principal to [Bob] shall be resolved in his favor."

Shortly after Elizabeth's death, Bob elected to treat the Marital Trust as a Qualified Terminable Interest Property (QTIP) Trust. Because of this election, no estate tax was due when Elizabeth's assets were transferred to the trust.[1] The taxes were deferred until Bob's

---

[1] Electing to treat the Marital Trust as a QTIP trust—and take advantage of the accompanying tax-deferral benefits—was possible because the Marital Trust provided for mandatory income distributions to Bob and was for his sole lifetime benefit. *See* 26 U.S.C. § 2056(b)(7).

3

death, at which point the value of the Marital Trust property would be included in his gross estate.[2]

Over Bob's lifetime, he distributed approximately $37.4 million in both income and principal from the Marital Trust to himself. When Bob died on December 20, 2014, approximately $5.5 million in assets remained in the trust. Upon his death, the Marital Trust terminated, subject to the administration of Bob's estate and transfer of the trust's remaining assets.

Bob's will directed that the Marital Trust assets remaining at his death would pass to the Bob and Elizabeth Lanier Descendants Trusts for the benefit of the First Marriage Children. Bob left other assets to his wife Elyse, reflecting an overall estate plan of distributing the Marital Trust's assets to the First Marriage Children and the other estate assets to Elyse. Bob's will named his attorney, Jay Houren, independent executor of Bob's estate. Cadence Bank served as successor trustee of the Marital Trust for winding-up purposes and also initially served as trustee of the various Descendants Trusts.

As part of an effort to expedite distribution of the trust and estate assets, Houren proposed a family settlement agreement (Agreement) to all interested parties of Bob's estate, including the First Marriage Children, Elyse, Elyse's children, Houren, and Cadence Bank.[3] Before

---

[2] After the surviving spouse's death, the value of his or her gross estate includes the value of the QTIP trust property. *Id.* § 2044.

[3] According to Houren, because of the potential estate-tax liability, and the fact that the Estate would look to the Marital Trust to satisfy taxes owed on the trust's assets, any significant distributions would otherwise have been

4

signing the Agreement, the parties obtained independent counsel and received "Disclosures" that included, among other documents, general accounting ledgers for Bob and the Marital Trust for the years 2009 through 2014. The Marital Trust ledgers reflect payments to Bob totaling $37,405,964.03 as of December 31, 2014, an amount equivalent to the total amount of trust distributions—both income and principal— made to Bob during his life. The payments are classified as "A/R – Robert C. Lanier" at the top of each page. Bob's ledgers reflect corresponding payments from the Marital Trust in the same amount, classified as "A/DIST – LANIER MATITAL [sic] TR."

By June 2015, all interested parties had signed the Agreement.[4] Article IV of the Agreement contains broad release provisions releasing the parties from any claims by any other parties related to "Covered Activities," which encompass "the formation, operation, management, or administration of [various] Trusts" including the Marital Trust; "the distribution (including, but not limited to, gifts or loans) (or failure to distribute) of any property or asset of or by [Bob] . . . or the Trusts"; and claims "related to, based upon, or made evident in the Disclosures" or "the facts set forth in Article I" of the Agreement.

---

delayed until after Houren filed the estate-tax return and received an estate-tax closing letter from the IRS. Houren attested that "[t]he Estate, with the input of all the affected parties, thus designed the Family Settlement Agreement to lessen the risk that the Estate would have to defend any claims by procuring very broad releases and indemnities from all persons interested in the Estate and Marital Trust . . . prior to its assets being distributed."

[4] The signatories include Elyse, the First Marriage Children, Cadence Bank, and Houren, among others.

5

After the parties executed the Agreement, Houren filed an estate-tax return, which did not list the distributions to Bob as either an asset of the Marital Trust or a liability of the estate. After Houren received the estate-tax closing letter in June 2016, he distributed the estate's assets, save for a small reserve to cover administrative expenses.

On December 1, 2016, Austin Trust Company, the successor trustee of the Descendants Trusts, sent a demand letter to Houren seeking repayment of the "$37,405,964.03 debt . . . that [Bob] owed to the Marital Trust at his death," as purportedly evidenced by the accounting ledgers. After receiving the demand letter, Houren conferred with Bob's accountant, Cecil Holley, who explained that the "A/R," or accounts receivable, designation on the Marital Trust ledgers is erroneous and merely a product of the accounting software he had used. Holley informed Houren that Bob had never borrowed money from the Marital Trust and that the accounting entries tracked distributions, not a debt. Houren thus concluded that no debt was owed and rejected Austin Trust's claim.

Houren subsequently filed a declaratory-judgment action against Austin Trust, as trustee of both the Marital Trust and the Descendants Trusts, and the First Marriage Children, seeking a declaration that the alleged $37.4 million debt does not exist. Austin Trust counterclaimed for a declaratory judgment that the debt *does* exist. Austin Trust later amended its pleadings to add an alternative claim that Bob, as trustee of the Marital Trust, had breached his fiduciary duty to the trust's remainder beneficiaries—the Descendants Trusts and the First Marriage Children (collectively, the Beneficiary Parties)—by making

6

unauthorized discretionary distributions of trust principal to himself during his life.

Houren moved for partial summary judgment, arguing that the evidence conclusively negates the existence of a debt and that both claims are barred by the Agreement's broad release provisions. The trial court granted Houren's motion, holding that (1) the alleged debt does not exist and (2) the Beneficiary Parties released all claims to recover the alleged debt as well as any claim for breach of fiduciary duty.[5] The trial court then rendered a final judgment awarding Houren attorney's fees.

The court of appeals affirmed, holding that, by executing the Agreement, the Beneficiary Parties released all claims that they may have had against the other parties to that Agreement. 647 S.W.3d 913, 922–23 (Tex. App.—Houston [14th Dist.] 2021). The court further held that the releases are valid regardless of any fiduciary duties Houren or Bob may have owed to the Beneficiary Parties. *Id.* at 922. The court of appeals thus affirmed the trial court's judgment without addressing its holding that no debt exists in the first instance. *Id.* at 923.

## II. Discussion

In this Court, the parties dispute both the scope and validity of the Agreement's releases. Austin Trust argues that the releases, even

---

[5] The trial court also sustained Houren's hearsay objections to the accounting ledgers and to the testimony of Austin Trust's expert regarding the ledgers. We will assume without deciding that the trial court erred in sustaining those objections because, considering that evidence, we nevertheless agree with the trial court that Houren was entitled to summary judgment.

7

if valid, do not encompass the debt claim because the Agreement expressly requires the executor to pay all Estate debts. It further argues that, because the Agreement purports to release a fiduciary from liability, its validity must be evaluated under a higher standard than that applied to ordinary arm's-length transactions. Specifically, Austin Trust contends that a full-disclosure or full-information standard applies to the transaction and that the Beneficiary Parties did not possess the requisite "full information" when they executed the Agreement.

As this case comes to us on appeal of a summary judgment, we review the judgment de novo to determine whether Houren, the movant, showed that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215–16 (Tex. 2003); TEX. R. CIV. P. 166a(c). We take as true all evidence favorable to the nonmovant and resolve reasonable inferences in the nonmovant's favor. *Energen Res. Corp. v. Wallace*, 642 S.W.3d 502, 509 (Tex. 2022).

## A. Scope of Releases

Before evaluating the validity of the Agreement's releases, we address Austin Trust's contention that they do not encompass the debt claim in the first instance.[6] For the reasons discussed below, we agree with Houren that the releases, if valid, bar the debt claim.

---

[6] Austin Trust does not dispute that the releases cover the alternative claim for breach of fiduciary duty.

A settlement agreement is a contract, and its construction is governed by legal principles applicable to contracts generally. *See Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). Our primary concern when interpreting contract language is to give effect to the parties' intentions, as expressed in the contract language. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 479 (Tex. 2019); *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex. 2011). We give terms their plain, ordinary, and generally accepted meaning unless doing so would defeat the parties' intent. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex. 2005). Further, we examine the instrument in its entirety in an effort to harmonize and give effect to all contractual provisions so that none will be rendered meaningless. *See Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). Contract terms cannot be viewed in isolation; each provision must be considered in the context of the contract as a whole. *Pathfinder Oil & Gas, Inc. v. Great W. Drilling, Ltd.*, 574 S.W.3d 882, 889 (Tex. 2019). If, under these rules of construction, the agreement's language can be given a certain or definite meaning, the agreement is not ambiguous, and the contract will be construed as a matter of law. *Great Am. Ins. Co. v. Primo*, 512 S.W.3d 890, 893 (Tex. 2017). Neither Houren nor Austin Trust asserts that the Agreement at issue is ambiguous, and we agree that it is not.

The parties agreed to release "the other Parties . . . with respect to any and all liability arising from any and all Claims . . . in connection

9

with the other Parties . . . and the Covered Activities."[7]  "Claims" is broadly defined as "any and all obligations, causes of action, suits, promises, agreements, losses, damages, charges, expenses, challenges, contests, liabilities, costs, claims, and demands of any nature whatsoever, known or unknown, which have now accrued or may ever accrue in the future."  The released claims include, but are not limited to, "claims of any form of sole, contributory, concurrent, gross, or other negligence, undue influence, duress, breach of fiduciary duty, or other misconduct by the other parties, the professionals, or their affiliates."  And as noted, "Covered Activities" includes claims based on the "operation, management, or administration of the Estate . . . or the Trusts"; "the distribution (including, but not limited to, gifts or loans) (or failure to distribute) of any property or asset of or by [Bob], the Estate, the Companies, or the Trusts"; and "any Claims related to, based upon, or made evident in the Disclosures" or the facts stated in Article I of the Agreement.

The parties' briefs assume, as do we, that this broad release language generally encompasses both (1) Austin Trust's claim that the Estate is obligated to repay the Descendants Trusts—to whom the Marital Trust's remaining assets were distributed—any funds that Bob may have personally borrowed from the Marital Trust while serving as its trustee and (2) its alternative claim that Bob breached his fiduciary duty as trustee of the Marital Trust by distributing principal to himself.

---

[7] The Agreement does not specifically include Bob or the Estate in its definition of Parties.  It does include Houren, both in his individual capacity and as independent executor of the Estate.

The former claim is based on an alleged loan of Marital Trust property and, as reflected in Austin Trust's own demand letter, was "made evident in the Disclosures."

As to that debt claim, however, Austin Trust asserts that Paragraph 3.11 of the Agreement, which recognizes Houren's obligation to pay Estate debts, overrides any release of liability among the parties regarding such debts. That is, Austin Trust argues that "the releases cannot be construed to release a debt that the face of the [Agreement] states will be paid." We disagree.

Paragraph 3.11 provides:

All Parties agree that the Executor and his successors have the obligation to pay all debts and claims of the Estate,[8] including Estate and Gift Taxes, as well as all Other Taxes (as defined herein). All Parties agree, acknowledge, and affirm that they may be liable, under Transferee Liability, for debts of or claims against the Estate, including for unpaid taxes, even after the assets of the Estate have been fully distributed. Accordingly, all Parties agree that the Executor shall have the right to demand and shall receive assets that have already been distributed from the Estate or the Trusts, to the other Parties or their Affiliates, for the purpose of paying any debts of or claims against the Estate, including Estate and Gift Taxes as well as Other Taxes (as detailed in this Section), and correcting any payments or distributions that were made in error or otherwise in excess of that [to] which the recipient was entitled after taking into account the amount of any claims, debts, Estate and Gift Taxes, or Other Taxes that must be paid.

---

[8] Although the language used is "debts and claims of the Estate," the Parties presumably are referring to "debts of and *claims against* the Estate," as the paragraph discusses payment of those debts and claims, not collection.

11

We first note that, while Houren's obligation is to pay all Estate debts, the only specific debts referenced—taxes—are demonstrably owed to third parties. Paragraph 3.11 merely echoes a legal duty the executor already has: to pay the Estate's debts. Further, the provision is principally focused on providing Houren the means to retrieve previously distributed assets in order to satisfy the obligation to pay those debts. That authority is consistent with the Marital Trust's status as a QTIP trust—whose assets were not subject to the federal estate tax until Bob's death—and with the Internal Revenue Code provision stating that the estate of the surviving spouse has the right to recover from the recipients of the trust property the amount of tax attributable to that property. *See* 26 U.S.C. § 2207A(a).[9]

Read in isolation, Paragraph 3.11's requirement that Houren pay "all" debts of and claims against the Estate does not distinguish between

---

[9] Section 2207A(a) provides:

If any part of the gross estate consists of property the value of which is includible in the gross estate by reason of section 2044 (relating to certain property for which marital deduction was previously allowed), the decedent's estate shall be entitled to recover from the person receiving the property the amount by which—

(A) the total tax under this chapter which has been paid, exceeds

(B) the total tax under this chapter which would have been payable if the value of such property had not been included in the gross estate.

Section 2044 in turn requires QTIP trust property for which the surviving spouse previously made a deduction to be included in the spouse's gross estate for tax purposes. 26 U.S.C. §§ 2044(a), (b)(1)(A), 2056(b)(7).

the source of those claims. But Houren argues that this paragraph, when read within the context of the entire Agreement, does not require payment of claims and debts that (1) are asserted by parties to the Agreement and (2) otherwise fall within the scope of the Agreement's releases in Article IV. We agree with the result Houren urges because other provisions within the Agreement confirm that Paragraph 3.11 was not intended to override the Article IV releases.

Specifically, Paragraph 2.04 of the Agreement states that *notwithstanding* the releases and indemnities therein, Houren has the right to seek recoupment of any taxes owed by the Estate. Paragraph 3.11 contains no similar "notwithstanding" language, indicating that it was not intended to create a carve-out for debts and claims that were otherwise released in Article IV.[10]

In sum, we hold that the Agreement's releases, if otherwise valid, encompass both the debt claim and the alternative breach-of-fiduciary-duty claim irrespective of the obligations that Paragraph 3.11 imposes on Houren.

---

[10] We note that if Paragraph 3.11—which obligates Houren to pay all Estate debts *and claims*—is as broad as the Beneficiary Parties suggest, then it seemingly nullifies the release of both the claim arising from failure to repay funds Bob allegedly borrowed *and* the alternative breach-of-fiduciary-duty claim arising from Bob's allegedly improper distributions. As noted, however, the Beneficiary Parties have never argued that Paragraph 3.11 overrides the releases of the latter claim; rather, they argue that they may pursue that claim only because the lack of full information renders the releases unenforceable.

## B. Validity of the Releases

As both of Austin Trust's claims fall within the scope of the Agreement's releases, we next assess whether those releases are enforceable. A family settlement agreement is an alternative method of estate administration in Texas that is a favorite of the law. *Salmon v. Salmon*, 395 S.W.2d 29, 32 (Tex. 1965). Generally, settlement agreements are enforceable in the same manner as any other written contract. However, when the agreement purports to release claims against one who owes the other party a fiduciary duty, the policies of freedom of contract and encouragement of final settlement agreements must be balanced against the duties of care and loyalty owed by the released fiduciary. *See Schlumberger Tech. Corp. v. Swanson,* 959 S.W.2d 171, 175 (Tex. 1997).

Under longstanding common law, trustees and executors owe the beneficiaries of a respective trust or estate a fiduciary duty of full disclosure of all material facts known to them that might affect the beneficiaries' rights. *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) (quoting *Montgomery v. Kennedy*, 669 S.W.2d 309, 313 (Tex. 1984)). With respect to agreements releasing a fiduciary from liability, the duty includes ensuring that the beneficiary "was informed of all material facts relating to the release." *Keck, Mahin & Cate v. Nat'l Union Fire Ins. Co.*, 20 S.W.3d 692, 699 (Tex. 2000). The condition on release agreements involving trustees is reflected in the Texas Trust Code, which provides that "[a] beneficiary who has full legal capacity *and is acting on full information* may relieve a trustee from any duty, responsibility, restriction, or liability as to the beneficiary that would

14

otherwise be imposed on the trustee by this subtitle, including liability for past violations." TEX. PROP. CODE § 114.005(a) (emphasis added).

Austin Trust argues that the Agreement's releases are invalid as to the claims at issue because the Beneficiary Parties were not informed of all material facts before executing the Agreement. We examine the released claims in turn.

### 1. Validity of the Debt-Claim Release

As discussed, the Beneficiary Parties agreed to release their claim that Houren, as executor of Bob's estate, was obligated to repay the Marital Trust sums that Bob allegedly borrowed from the trust's assets. Austin Trust argues that the release is not valid because Houren owed fiduciary duties to the Estate's beneficiaries, including the Beneficiary Parties, and thus could be released from liability to those beneficiaries only for matters as to which all material facts had been disclosed. *Huie*, 922 S.W.2d at 923; *see also* TEX. EST. CODE § 405.003(a) (providing for an executor to obtain a judicial release of liability with regard to "matters relating to the past administration of the estate that have been fully and fairly disclosed"). Houren responds that when the Agreement was executed, he owed no such duty to the First Marriage Children because they were beneficiaries of the Marital Trust, not the Estate. We agree with Houren.

We have described an estate executor as "trustee of the property of the estate, . . . subject to the high fiduciary standards applicable to all trustees." *Humane Soc'y v. Austin Nat'l Bank*, 531 S.W.2d 574, 577 (Tex. 1975). The executor's duty runs to the estate and its beneficiaries. *See id.*; *Huie*, 922 S.W.2d at 922. The duty is reflected in the Estates Code,

15

which "vests" a decedent's estate immediately in his devisees or heirs at law, subject to payment of the decedent's debts, TEX. EST. CODE § 101.001, and requires the executor or administrator to "recover possession of the estate and hold the estate in trust to be disposed of in accordance with the law," *id.* § 101.003.

Here, it is undisputed that no Estate assets passed by devise to the First Marriage Children, either directly or via the respective Descendants Trusts of which they were beneficiaries, under Bob's will.[11] Although Bob exercised the testamentary power of appointment granted in Elizabeth's will to direct the Marital Trust's remaining assets to pass to the trustee of the Descendants Trusts, those assets were not probate assets that passed through the Estate, and Houren was not responsible for taking possession or disposing of them. Rather, Cadence Bank (and later Austin Trust), as successor trustee of the Marital Trust, was responsible for distributing the trust's assets in accordance with the direction given in the will. Because the Beneficiary Parties had an interest in only nontestamentary property at the time the Agreement was signed, they did not qualify as beneficiaries of Bob's estate to whom Houren owed a corresponding fiduciary duty. *See Mohseni v. Hartman*,

---

[11] Bob's will named the First Marriage Children contingent beneficiaries of Bob's residuary estate in the event Elyse and her descendants did not survive Bob by at least ninety days. That contingency did not come to pass, and at the time the Agreement was executed, the First Marriage Children were not beneficiaries of any probate assets. *See Keck*, 20 S.W.3d at 699 & n.3 (noting that a presumption of unfairness applied to a release agreement between attorney and client because of the fiduciary nature of the relationship but that the presumption would not have arisen if the client had severed the attorney–client relationship and hired new counsel before signing the release).

16

363 S.W.3d 652, 657 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("[A]n independent executor does not owe a fiduciary duty to persons who claim an interest in a decedent's non-testamentary property; to them, she owes no legal duty of care."). Rather, any duty Houren owed to the Beneficiary Parties as executor of the Estate was no different from the duty he owed to any other unsecured creditor.

Austin Trust's arguments to the contrary are unpersuasive. First, Austin Trust contends that because Bob's will created the Descendants Trusts and directed the Marital Trust assets there, those assets "were intimately connected to Bob's Estate." But Austin Trust does not assert that they were testamentary assets or that Houren had any hand in their distribution. Nor do we find support for the legal significance Austin Trust seeks to attach to Bob's exercise of the testamentary power of appointment. Second, Austin Trust notes that the Agreement's signature pages designated each of the First Marriage Children as, among other things, a "contingent beneficiary of the Estate." That designation does not change the facts or create a fiduciary relationship that did not otherwise exist.

Finally, to the extent Austin Trust argues that an independent executor owes a fiduciary duty to the estate's creditors, we reject that contention. We have never recognized such a relationship, nor does the Estates Code. As the Fourteenth Court of Appeals persuasively explained in *FCLT Loans, L.P. v. Estate of Bracher*, while an independent executor has various statutory duties regarding the

17

approval and payment of proper claims against the estate,[12] the language of those provisions gives no indication that the executor holds the estate's assets in trust for the benefit of creditors or otherwise owes them a fiduciary duty. 93 S.W.3d 469, 480–81 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see also Mohseni*, 363 S.W.3d at 658 ("The executor holds the estate property in trust for the beneficiaries because they have a vested right in that property, but she does not hold it in trust for the creditors, whose claims against the estate are contingent.").

Both *FCLT* and *Mohseni* recognized and declined to follow two earlier court of appeals decisions that "described the relationship between an independent executor and a creditor of the estate as 'fiduciary.'" *FCLT*, 93 S.W.3d at 481 (discussing *Ertel v. O'Brien*, 852 S.W.2d 17, 21 (Tex. App.—Waco 1993, writ denied), and *Ex parte Buller*, 834 S.W.2d 622, 626 (Tex. App.—Beaumont 1992, orig. proceeding)). Those designations were unpersuasive, as the *Ertel* court provided no analysis supporting its conclusion, 852 S.W.2d at 21, and the *Buller* court relied on cases that simply do not discuss the duty owed by an independent executor to estate creditors under our statutory scheme, 834 S.W.2d at 626. Evaluating these conflicting decisions, in *United States v. Marshall* the Fifth Circuit agreed with the reasoning in *FCLT* and concluded that an independent executor does not owe estate creditors a fiduciary duty under Texas law. 798 F.3d 296, 315 (5th Cir. 2015). We confirm the Fifth Circuit's assessment.

---

[12] *See* TEX. EST. CODE §§ 403.051–.059 (governing claims against the estate in an independent administration).

In the absence of a fiduciary relationship between Houren as executor and the Beneficiary Parties as creditors, we reject Austin Trust's argument that "full disclosure" is the standard for evaluating the releases of the debt claim. Accordingly, we evaluate their enforceability using the same standard applicable to any other contract. *Williams*, 789 S.W.2d at 264 ("Under Texas law, a release is a contract . . . ."). In this Court, Austin Trust offers no contractual grounds to invalidate the releases apart from the absence of full disclosure. The court of appeals therefore properly affirmed the trial court's summary judgment on the debt claim.[13]

## 2. Validity of the Breach-of-Fiduciary-Duty-Claim Release

Although the Agreement does not purport to release a fiduciary from liability with respect to the debt claim, the same cannot be said with respect to the alternative breach-of-fiduciary-duty claim. That claim, though asserted against Houren as executor of Bob's estate, is premised on Bob's actions taken in his capacity as trustee of the Marital Trust. As discussed, Austin Trust asserts that Bob (as trustee) distributed trust principal to himself (as beneficiary) in a manner that violated the trust's limitations on such distributions, causing the trust to diminish significantly in value during Bob's life. In doing so, Austin Trust argues, Bob violated the fiduciary duty he owed to the Beneficiary Parties as contingent beneficiaries of the trust. *See* TEX. PROP. CODE

---

[13] To the extent Houren contends—as an alternative basis on which to affirm the court of appeals' judgment—that he conclusively established the debt's nonexistence, we need not reach that argument.

19

§ 111.004(2), (6) (defining "beneficiary," to whom the trustee owes a fiduciary duty, to include contingent beneficiaries); *cf. Corpus Christi Bank & Tr. v. Roberts*, 597 S.W.2d 752, 755 (Tex. 1980) (holding that a trustee's duty to provide an accounting to beneficiaries survived his death). The merits of that claim were not the subject of Houren's motion for summary judgment and are not before us. We address only the Agreement's release of the claim.

**a. Trust Beneficiary's Statutory Right to "Full Information"**

In *Slay v. Burnett Trust*, we confirmed the "established rule" governing when a beneficiary's "consent to an act of his trustee which would constitute a violation of the duty of loyalty precludes him from holding the trustee liable for the consequences of the act." 187 S.W.2d 377, 390 (Tex. 1945). We explained that such consent does not foreclose liability "unless it is made to appear that when he gave his consent the beneficiary had full knowledge of all the material facts which the trustee knew." *Id.* (citing RESTATEMENT OF TRUSTS § 216 (AM. L. INST. 1935)); *see also Keck*, 20 S.W.3d at 699 (noting a fiduciary's burden to establish that an agreement releasing the fiduciary from liability was "fair and reasonable" and that the other party "was informed of all material facts relating to the release"); RESTATEMENT (THIRD) OF TRUSTS § 97 (AM. L. INST. 2012).

Further, releases of liability for certain fiduciaries, including trustees, are governed by statute. Under the Trust Code, "[a] beneficiary who has full legal capacity and is acting on full information may relieve a trustee from any duty, responsibility, restriction, or liability as to the beneficiary that would otherwise be imposed on the

20

trustee by this subtitle, including liability for past violations." TEX. PROP. CODE § 114.005(a).

Without addressing Section 114.005, the court of appeals here identified six "factors" it considered in holding that the releases were valid:

> (1) the terms of the contract were negotiated rather than boilerplate, and the disputed issue was specifically discussed; (2) the complaining party was represented by legal counsel; (3) the negotiations occurred as part of an arms-length transaction; (4) the parties were knowledgeable in business matters; (5) the release language was clear; and (6) the parties were working to achieve a once and for all settlement of all claims so they could permanently part ways.

647 S.W.3d at 923 (citing *Harrison v. Harrison Ints., Ltd.*, No. 14-15-00348-CV, 2017 WL 830504, at *5 (Tex. App.—Houston [14th Dist.] Feb. 28, 2017, pet. denied)). These factors were gleaned from this Court's precedent governing when a settlement agreement's disclaimer of reliance on the parties' representations forecloses one of the parties from claiming the agreement was fraudulently induced and thus unenforceable. *See Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008) (identifying the first five factors as "guid[ing] our reasoning" in evaluating disclaimer-of-reliance clauses under a totality-of-the-circumstances approach, and the sixth as an "additional factor urging rejection of fraud-based claims" (emphasis removed)). We apply the so-called *Forest Oil* factors in an effort to "balance society's interest in protecting parties against fraudulently induced promises with its interest in enabling parties to 'fully and finally resolve disputes between

21

them.'" *Transcor Astra Grp. S.A. v. Petrobras Am. Inc.*, 650 S.W.3d 462, 473 (Tex. 2022) (quoting *Schlumberger*, 959 S.W.2d at 179).

Austin Trust contends that the court of appeals erred in utilizing the *Forest Oil* factors—which it contends were established to evaluate the validity of nonfiduciary, arm's-length transactions—to supplant the "full disclosure" standard applicable to releases of fiduciary liability. Houren responds that (1) Austin Trust's claims are premised on the very disclosures it now asserts were inadequate; (2) assuming Houren had a duty to disclose all material facts within his knowledge, the evidence shows he was not aware of the potential significance of the ledger entries or that they contained any errors; (3) the court of appeals correctly found instructive this Court's framework for assessing reliance disclaimers in fraud cases; and (4) applying those factors, the parties to the Agreement knowingly and voluntarily surrendered their right to disclosure of information beyond what was provided.

We recently acknowledged in *Petrobras* that, "[a]s a general rule, a transaction between fiduciaries is not an arm's-length transaction but instead requires higher fiduciary standards that require full disclosure of all material facts." *Id.* at 476 (citing *Schlumberger*, 959 S.W.2d at 175). *Petrobras* involved the enforceability of a reliance disclaimer in a settlement agreement resolving litigation stemming from the termination of a joint venture between two corporations. *Id.* at 468. Petrobras sought to invalidate the agreement on the ground that Astra committed fraud by offering bribes to Petrobras officials (and failing to disclose the bribes) during the settlement negotiations. *Id.* at 470. Petrobras further contended that Astra's agents owed fiduciary duties

22

to Petrobras during the settlement negotiations because they served as officers and directors of the terminated joint venture. *Id.*

Applying the *Forest Oil* factors, we concluded that the reliance disclaimer was enforceable and precluded Petrobras's fraud claim. *Id.* at 478. We addressed Petrobras's fiduciary-duty argument as part of our examination of the third factor—whether the parties dealt with each other in an arm's-length transaction—but we expressed doubt as to whether fiduciary duties were owed to Petrobras in the first instance. *Id.* at 475–76. "[E]ven if the Astra individuals owed fiduciary duties to disclose material information to Petrobras during the [settlement] negotiations," we explained, "we cannot conclude that Petrobras could not have knowingly and intentionally disclaimed reliance on the individuals' representations under the[] circumstances." *Id.* at 477. Those circumstances, including the fact that the joint venture had terminated years earlier and the companies had been litigating numerous disputes since, led us to determine that even if the third *Forest Oil* factor weighed against enforcing the reliance disclaimer, "it does not weigh so heavily as to overcome the other factors." *Id.*

This Court has not addressed whether the *Forest Oil* factors—which assist courts in evaluating whether a disclaimer of reliance in a settlement agreement defeats a claim of fraudulent inducement—should be used to assess the validity of a release of a breach-of-fiduciary-duty claim. Nor does it appear that any Texas court, including the court of appeals here, has addressed how those factors should interact with the established common-law requirements for trustee releases we adopted in *Slay*. But we need not definitively answer that question in

this case because (1) Section 114.005 of the Trust Code expressly enables beneficiaries to consent to the releases at issue when they have "full information" and (2) as discussed below, we hold that the Marital Trust's beneficiaries had such "full information" when they executed the Agreement.

Under the Trust Code, a "trustee who commits a breach of trust is chargeable with any damages resulting from such breach of trust, including . . . any loss or depreciation in value of the trust estate as a result of the breach of trust." TEX. PROP. CODE § 114.001(c)(1). However, as noted, "[a] beneficiary who has full legal capacity and is acting on full information may relieve a trustee from any duty, responsibility, restriction, or liability that would otherwise be imposed on the trustee by this subtitle, including liability for past violations." *Id.* § 114.005(a). Here, the Beneficiary Parties agreed to release Houren, as executor of Bob's estate, from liability for Bob's alleged breach of the Marital Trust, thereby triggering Section 114.005's conditions.

Houren argues that Section 114.005 does not apply to the releases at issue for two reasons. First, Houren contends that Section 114.005 applies only to releases by beneficiaries and thus does not apply to the release executed by Cadence Bank as *trustee* of the Descendants Trusts. However, the Descendants Trusts were themselves remainder beneficiaries of the Marital Trust, and Cadence Bank acted on behalf of the Descendants Trusts in executing the Agreement. Further, the First Marriage Children also executed the Agreement and were themselves beneficiaries of those trusts.

24

Second, Houren argues that Section 114.005 cannot apply to a release of liability involving a deceased trustee because subsection (b) provides that the "release must be in writing and delivered to the trustee" and the Legislature would not have imposed an impossible condition such as delivery to a dead trustee. Again, we disagree. Houren does not dispute that the executor or administrator of a deceased trustee's estate may be sued for breaches of fiduciary duty committed by the deceased trustee, *see Corpus Christi Bank & Tr.*, 597 S.W.2d at 755, and we see no reason why delivery of a release to that executor or administrator would not qualify as delivery to the trustee. Had the Legislature intended Section 114.005 not to apply to past violations by deceased trustees, it would have said so. Accordingly, we hold that Section 114.005 applies to the releases in the Agreement insofar as they release Houren from liability for Bob's alleged breach of fiduciary duty in distributing principal from the Marital Trust in violation of the trust's terms.[14]

Houren next argues that, even if Section 114.005 otherwise applies to the Agreement's releases, the Beneficiary Parties waived their entitlement to any information beyond what was provided and, in any event, they had full information when they executed the releases. The Beneficiary Parties respond that the statutory right to full information cannot be waived, that they lacked full information when they signed the Agreement, and that the releases are thus unenforceable. Because we agree with Houren that the evidence conclusively establishes the

---

[14] Again, we express no opinion on the merits of the claim.

25

Beneficiary Parties were acting on the requisite "full information," as discussed below, we assume without deciding that the right cannot be waived. *See Keck*, 20 S.W.3d at 699 (noting that the burden is on the fiduciary to establish that the releasing party was informed of all material facts relating to the release); *see also Draughon v. Johnson*, 631 S.W.3d 81, 88 (Tex. 2021) (holding that a party who moves for summary judgment must conclusively establish the elements of that claim or defense).

### b. The Beneficiary Parties Had Full Information

Section 114.005 does not define "full information," but we presume the Legislature enacted the provision "with full knowledge of the existing condition of the law and with reference to it." *See JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 486 (Tex. 2019); *see also Phillips v. Beaber*, 995 S.W.2d 655, 658 (Tex. 1999) (noting that "we presume that the Legislature acted with knowledge of the common law"). In the context of Section 114.005, we see nothing indicating that the Legislature intended "full information" to mean something other than we have required under the common law—specifically, "full knowledge of all the material facts which the trustee knew." *Slay*, 187 S.W.2d at 390.

Both Section 114.005 and *Slay* echo the Restatement (Third) of Trusts, which, in turn, gives color to the phrase "acting on full information." *See* RESTATEMENT (THIRD) OF TRUSTS § 97(b) (requiring that a beneficiary be "aware of the beneficiary's rights and of all material facts and implications that the trustee knew or should have known

26

relating to the matter" at the time of consent or ratification for it to be valid).  According to the Restatement, which we find persuasive:

> It is not necessary that the trustee inform the beneficiary of all the details of which the trustee has knowledge; but, because of the strict fiduciary relationship between trustee and beneficiary, a trustee who would rely on a beneficiary's consent, ratification, or release normally has the burden of showing that the beneficiary (or his or her representative) was sufficiently informed to understand the character of the act or omission and was in a position to reach an informed opinion on the advisability of consenting, ratifying, or granting a release. . . .

*Id.* § 97(b) cmt. e.  Whether such "full information" has been provided necessarily depends on the facts and circumstances of each case.

The Restatement and our precedent clarify the purpose behind the full-information requirement, which is to ensure the beneficiary makes a meaningful and informed decision before signing away any rights he may have.  Knowledge of the full scope, extent, and details of the acts the beneficiary is releasing, while certainly preferable, is not required so long as he is informed enough to understand the nature and consequences of what he is giving up.

We hold that the Beneficiary Parties were sufficiently informed to understand the character of the act they were releasing and were in a position to reach an informed opinion on the advisability of agreeing to the release.  This conclusion is supported by both the parties' acknowledgments in the Agreement itself as well as the circumstances surrounding its execution.

All parties to the Agreement "agree[d], acknowledge[d], and affirm[ed] that . . . the facts set forth in Article I of [the] Agreement are

true and correct and hereby incorporated into [the] Agreement as agreed to, acknowledged, and affirmed facts." Article I recites that Elizabeth's will established the Marital Trust, of which Bob was the trustee, and directed the Trust "to pay [Bob] all of the net income of the Marital Trust and such amounts of principal as the trustee . . . in his sole judgment may determine are necessary for [Bob's] health, support, or maintenance in his accustomed standard of living." The Agreement further describes Bob's testamentary power of appointment over the Marital Trust and his election to treat the Marital Trust as a QTIP trust under 26 U.S.C. § 2056(b)(7). Additionally, several provisions of the Agreement reference "distributions" from the Marital Trust to Bob.

In addition to the numerous factual recitations in Article I, the Agreement recites that the parties were represented by counsel of their choosing,[15] had a reasonable opportunity to read and understand the Agreement, including the Disclosures, and had a reasonable opportunity to consult with and ask questions of their attorneys regarding the Agreement and the Disclosures before executing the Agreement. The parties further acknowledged that Houren had "not conducted a significant accounting or investigation of the facts contained in . . . the Disclosures," they had not requested that he conduct any such accounting or investigation, and they had requested execution of the Agreement "without incurring the cost or delay likely involved with such

_____

[15] The Agreement specifically says that the parties were represented by counsel or consciously chose not to be represented by counsel. However, Houren attested that "[a]ll parties were represented by independent counsel when they executed the Family Settlement Agreement."

accountings or investigations in order to ensure an orderly and expeditious settlement of the Estate." Finally, in connection with the releases, the Beneficiary Parties acknowledged that they "had access to or been given the opportunity to review relevant records and other materials as [they] may have requested before executing this Agreement, including all the Disclosures," and they had "examined such records and materials, or caused them to be examined on [their] behalf, or after receiving appropriate advice from legal counsel and others ha[d] declined to do so."

Turning to the Disclosures, the parties' focus in this suit is on the general ledgers for 2009 through 2014 for both Bob and the Marital Trust. As noted, Bob's ledgers reflect "A/DIST," or "accumulated distributions," from the Marital Trust in the total amount of $37,405,964.03 as of Bob's death. And the Marital Trust ledgers reflect payments to Bob in the same amount that are designated "A/R," or "accounts receivable."

Austin Trust argues that the summary-judgment record establishes, or at least raises a fact issue, that the Beneficiary Parties were not acting on the requisite "full information" in releasing their breach-of-fiduciary-duty claims because (1) by classifying the Marital Trust's payments to Bob as "accounts receivable," the Disclosures reflected $37.4 million in loans to Bob, not distributions that may have been improper under the trust documents; (2) Houren now claims that the disclosed ledgers' classification of the payments to Bob as accounts receivable rather than distributions was erroneous; and (3) the financial statements on which Houren relied in seeking summary judgment on

29

the ground that no debt to the trust exists were *not* part of the disclosures associated with the Agreement. We disagree, as Austin Trust fails to recognize the full context in which the Disclosures were provided and reviewed.

First, although the Marital Trust ledgers classify the payments to Bob as accounts receivable, the corresponding ledgers for Bob classify those payments as accumulated distributions, not accounts payable. And the ledgers contain no other notation or description indicating that the payments were a loan or were otherwise required to be reimbursed.

Second, the Agreement specifically discusses the Marital Trust's status as a QTIP trust under 26 U.S.C. § 2056(b)(7), which is what allowed the trust's assets to be deducted from the value of Elizabeth's estate for estate-tax purposes. Section 2056(b)(7) confirms that to qualify for the QTIP deduction, the surviving spouse (Bob) must be "entitled to all the income from the property, payable annually or at more frequent intervals." Consistent with that provision, Elizabeth's will directed the Marital Trust to pay Bob "all" the trust's net income, and the Agreement specifically references that requirement. This context is a significant indication that the "A/R" classification in the Marital Trust ledgers did not by itself reflect a loan because, if it did, it would mean that Bob had agreed to repay every cent the Marital Trust ever distributed, which would necessarily include income as well as principal in contravention of the trust's QTIP status.

Indeed, although Austin Trust initially demanded that Houren repay the entire $37.4 million reflected in the ledgers as a debt Bob purportedly owed to the Marital Trust, Austin Trust alleged in its

30

pleadings that Bob "fully intended to repay out of his own pocket any and all sums *in excess of income distributions* that he may ever have received from the Marital Trust." (Emphasis added.) Austin Trust thus concedes that at least some of the payments reflected in the ledgers were *not* loans, notwithstanding the "A/R" designation. And nothing in the ledgers indicates that income and principal were being treated differently.

Finally, the Agreement reflects that the parties were represented by and had the opportunity to confer with their attorneys regarding the Agreement and the Disclosures. While the beneficiaries' representation by counsel is not a substitute for "full information," it is an indication that the beneficiaries, through their counsel, were able to appreciate the discrepancy between the A/R designation in the Marital Trust ledger and the A/DIST designation in Bob's ledger, as well as the impact of classifying the entire amount of the distributions to Bob as loans.[16]

In sum, while the sufficiency of disclosure will depend on the facts and circumstances of each case, the underlying legal principle remains constant: a beneficiary has full information when he is in a position to make a meaningful and informed decision about releasing a trustee from liability or, said differently, when he is informed enough to understand the nature and consequences of what he is releasing. Here, the Beneficiary Parties were fully aware that they were waiving the right to challenge the propriety of any of the prior distributions from the Marital

---

[16] We also reiterate that, even if the ledgers indicated that the distributions were loans Bob was obligated to repay, the Beneficiary Parties released those claims as well.

Trust, even if they did not know the exact amount, in exchange for an expedited distribution of the trust's remaining assets.

### III. Conclusion

We hold that the family settlement agreement's releases encompass both Austin Trust's debt claim as well as its breach-of-fiduciary-duty claim. We further hold that the releases are valid and that the trial court properly granted summary judgment in Houren's favor. Accordingly, we affirm the court of appeals' judgment.

Debra H. Lehrmann
Justice

**OPINION DELIVERED:** March 24, 2023